## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| GWENDOLYN POND,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>　　　　　Defendant. | CASE NO. 1:22-CV-01237<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Gwendolyn Pond ("Plaintiff" or "Ms. Pond") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and is before the undersigned pursuant to the consent of the parties.  (ECF Doc. 7.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

### I.　　　Procedural History

Ms. Pond filed applications for DIB and SSI on April 12, 2019.  (Tr. 26, 551-57, 558-63.) She asserted a disability onset date of January 1, 2015 (Tr. 26, 551, 558), and alleged that she was disabled due to rare blood anemia, fibromyalgia, osteoarthritis, pseudotumor cerebri, scoliosis, neuropathy, migraines, hypertension, depression, and anxiety (Tr. 411-12, 468, 484, 602).  Her applications were denied at the initial level (Tr. 468-81) and upon reconsideration (Tr.

1

484-95).  She requested a hearing (Tr. 496-98), which was held before an Administrative Law

Judge ("ALJ") on July 29, 2020 (Tr. 45-63).

On October 1, 2020, the ALJ issued an unfavorable decision, finding Ms. Pond had not

been under a disability within the meaning of the Social Security Act from January 1, 2015,

through the date of the decision.  (Tr. 23-44.)  Ms. Pond requested review by the Appeals

Council (Tr. 547-50), which initially denied Ms. Pond's request for review on June 9, 2021 (Tr.

10-16), set aside that action to consider additional information (Tr. 1), and ultimately denied Ms.

Pond's request for review on June 22, 2022 (Tr. 1-7), making the ALJ's decision the final

decision of the Commissioner.  Ms. Pond then filed this pending appeal (ECF Doc. 1), which is

fully briefed and ripe for review (ECF Docs. 9, 10).

## II.    Evidence

## A.    Personal, Educational, and Vocational Evidence

Ms. Pond was born in 1974.  (Tr. 38, 51.)  She was 40 years old on the alleged disability

onset date.  (Tr. 38.)  She lived with her stepfather.  (*Id*.)  She had her GED and attended two

years of college.  (Tr. 38, 51, 603.)  She has past relevant work as a fast-food manager /

supervisor and kitchen supervisor.  (Tr. 37-38, 51-53, 603.)  She stopped working her fast-food

job in 2015.  (Tr. 53, 602.)

## B.    Medical Evidence

### 1.    Treatment History

#### i.    Physical Impairments

Treatment History for Pain

On May 14, 2015, Ms. Pond presented to Antoinette Abou-Haidar, M.D., her primary

care physician at MetroHealth, for evaluation of low back pain.  (Tr. 715.)  She reported right-

sided low back pain for two years with gradual worsening over time.  (*Id*.)  She had pain down her right leg, but no motor weakness or paresthesia.  (*Id*.)  She said Naproxen did not help with her pain.  (*Id*.)  Examination findings revealed normal flexion with restricted extension and lateral rotation.  (Tr. 716.)  Levoscoliosis, right sided paraspinal tenderness, and positive straight leg raise on the right were observed.  (*Id*.)  There was no motor weakness.  (*Id*.)  Dr. Abou-Haidar diagnosed lumbar spondylosis, referred Ms. Pond for Physical Medicine & Rehabilitation ("PM&R") and physical therapy, and prescribed Mobic and Flexeril.  (Tr. 717.)

Ms. Pond presented to Monique Boudreau, PT, for a physical therapy evaluation at MetroHealth on May 29, 2015.  (Tr. 735.)  She rated her pain as varying in intensity between 7/10 and 9/10.  (Tr. 737.)  Examination revealed decreased range of motion, strength, and flexibility, and tenderness to palpation in the right paraspinal.  (Tr. 738-39.)  Dural stretch and straight leg raise were positive on the right and negative on the left.  (Tr. 739.)  Ms. Pond's gait was independent without assistive device, but slow with decreased trunk rotation.  (*Id*.)

Ms. Pond presented to Ann Harrington, APRN-CNS, in the PM&R clinic at MetroHealth on June 5, 2015, for low back and leg pain.  (Tr. 747-48.)  She said Flexeril helped the most.  (Tr. 748.)  She had just started physical therapy and had not had injections or surgery.  (*Id*.)  CNS Harrington reviewed a lumbar spine x-ray from October 2013, noting it showed levoscoliosis and degenerative disc disease at L5-1.  (Tr. 750-51.)  A lumbar examination revealed: decreased lumbar lordotic, severely decreased range of motion, tenderness on palpation, and fullness in the lumbosacral paraspinal muscles.  (Tr. 751.)  There was no evidence of trigger points and a straight leg raise was negative.  (*Id*.)  Ms. Pond's neurological examination was normal, including normal strength, sensation, reflexes, fine motor coordination,

heel walk, toe walk, and gait.  (*Id*.)  CNS Harrington continued prescriptions for Mobic, Flexeril, and gabapentin, and recommended that Ms. Pond continue with physical therapy.  (*Id*.)

Ms. Pond attended six physical therapy sessions from June 23, 2015 through July 14, 2015.  (Tr. 773-78, 824-28.)  At the last appointment, on July 14, 2015, it was noted that Ms. Pond showed minimal improvement and had not met the majority of her goals.  (Tr. 826.)  She was discharged with a home exercise program due to her lack of progress.  (*Id*.)

During a follow-up appointment with CNS Harrington on July 6, 2015, Ms. Pond reported 10% relief since her last visit.  (Tr. 802.)  Her gabapentin dose had been increased.  (*Id*.) She was taking Flexeril, which helped, but Mobic did not help.  (Tr. 803.)  Examination findings were similar to those from the June 5, 2015 appointment.  (*Compare* Tr. 805 *with* Tr. 751.)  CNS Harrington added Elavil to Ms. Pond's prescriptions.  (Tr. 807.)

Ms. Pond returned to CNS Harrington on August 6, 2015.  (Tr. 831.)  She reported that taking Elavil at night was helping, but she was not sleeping through the night.  (Tr. 832.)  She described her pain when walking as severe burning that radiated down the dorsal aspect of her left leg to the bottom of her foot with associated numbness and tingling.  (*Id*.)  She said that physical therapy had helped "somewhat."  (*Id*.)  Examination findings were similar to those from prior appointments.  (*Compare* Tr. 835 *with* Tr. 751, 805.)  CNS Harrington ordered a lumbar spine MRI.  (Tr. 835.)

Ms. Pond had her lumbar spine MRI on August 17, 2015.  (Tr. 838.)  The impression was multi-level degenerative changes, worse at the L5-S1 level, and a left paracentral disc extrusion at the T10-11 level.  (Tr. 838, 854.)

Ms. Pond returned to CNS Harrington on September 4, 2015, reporting her symptoms were unchanged.  (Tr. 851.)  Examination findings were similar to prior appointments.

(*Compare* Tr. 854 *with* Tr. 751, 805, 835.)  CNS Harrington discontinued gabapentin, continued Elavil, added Lyrica, and recommended L5-1 epidural injections and weight loss.  (Tr. 854.)

Ms. Pond presented to Michael Kelly, M.D., at MetroHealth on September 9, 2015, for a spine consultation.  (Tr. 858.)  Her examination showed positive Faber and straight leg raise bilaterally but normal gait, strength, sensation, and reflexes.  (Tr. 861.)  Dr. Kelly reviewed the MRI findings, indicating it showed "mild diffuse degenerative changes and left L5/S1 disc protrusion with mild/moderate foraminal stenosis."  (Tr. 862.)  He indicated "all of her pain symptoms [could not] be explained by the MRI."  (*Id*.)  He did not recommend surgery.  (*Id*.)  He advised that "weight loss and stopping smoking [were] the two best strategies to improve her pain and overall spine health."  (*Id*.)

Ms. Pond returned to CNS Harrington on October 5, 2015, for follow up.  (Tr. 866-70.)  She reported that her symptoms were unchanged.  (Tr. 867.)  She had not started Lyrica for insurance reasons.  (*Id*.)  She reported that Elavil was helping her sleep better at night and she was taking gabapentin.  (*Id*.)  She wanted to try Lyrica before considering an epidural injection.  (*Id*.)  Examination findings were similar to those from prior appointments.  (*Compare* Tr. 870 *with* Tr. 751, 805, 835, 854.)  CNS Harrington recommended that Ms. Pond discontinue gabapentin once she started Lyrica due to minimal response to gabapentin.  (Tr. 870.)  CNS Harrington instructed Ms. Pond to continue with Elavil, home exercises, and weight loss.  (*Id*.)

During a January 28, 2016 follow-up appointment with CNS Harrington, Ms. Pond reported trying Lyrica for a few weeks.  (Tr. 902-03.)  She said it helped her symptoms but made her feel sad, so she stopped taking it and restarted gabapentin.  (Tr. 902-03.)  She had stopped taking Elavil because it did not help.  (Tr. 903, 906.)  She also reported restless legs at night and pain throughout her body, including in her shoulders, spine, and legs.  (Tr. 903.)  Examination of

5

the bilateral lower extremities revealed 5/5 strength, intact sensation to light touch, and normal reflexes.  (Tr. 905.)  Ms. Pond was able to stand on her toes and heels.  (*Id.*)  CNS Harrington recommended that she resume gabapentin and Elavil, continue with home exercises and weight loss; she also continued to recommend epidural injections, but Ms. Pond declined.  (Tr. 906.)

Ms. Pond returned to CNS Harrington on June 1, 2016.  (Tr. 1028.)  She reported that increased dosages of gabapentin and Elavil initially helped but had stopped working.  (Tr. 1029.)  She reported sleepiness, restless legs at night, and pain throughout her body.  (*Id.*)  Examination of the bilateral lower extremities continued to reveal 5/5 strength, intact sensation to light touch, and normal reflexes, and Ms. Pond remained able to stand on her toes and heels.  (Tr. 1031.)  CNS Harrington's impression was: "Chronic pain syndrome AEB sleep disturbance, low energy level, sense of suffering, multiple sites of pain and length of time."  (Tr. 1032.)  CNS Harrington instructed Ms. Pond to continue gabapentin, decrease Elavil, continue Flexeril, and return in three weeks to start Cymbalta.  (*Id.*)  She continued to recommend weight loss.  (*Id.*)

Ms. Pond sought emergency room treatment for right foot and ankle pain with swelling on June 27, 2016.  (Tr. 1050.)  She said she developed right heel pain and swelling about one week earlier while walking outside, and that her pain was more severe with walking in heels.  (*Id.*)  She was treated with Naproxen and told to use rest, ice, compression, and elevation ("RICE") therapy.  (Tr. 1052, 1072.)

Ms. Pond returned to CNS Harrington on June 30, 2016, to start Cymbalta.  (Tr. 1071-72.)  She complained of pain in her right heel, knees, hands, and left big toe.  (Tr. 1072.)  She reported the swelling and pain in her right heel had improved since she was at the emergency room, but that her heel had not returned to baseline.  (*Id.*)  She was taking gabapentin and Flexeril as needed, but had weaned from Elavil.  (*Id.*)  Examination of her right ankle revealed

6

pain to palpation, swelling, warmth, and painful range of motion.  (Tr. 1075.)  CNS Harrington noted that Ms. Pond's new heel pain was consistent with Achilles tendonitis.  (Tr. 1075.)  She discontinued Naproxen because it was not working, ordered x-rays of the bilateral knees and right foot, and recommended a walking boot, RICE, and Lodine as needed.  (*Id*.)

Ms. Pond saw CNS Harrington on September 15, 2016, for follow up.  (Tr. 1142.)  Her foot pain had resolved.  (Tr. 1143.)  She said Cymbalta made her slightly tired, but was helping with her pain.  (Tr. 1143-44.)  She also said that Topamax, which she had started for her migraines, was helping with her body pain.  (Tr. 1144.)  She was not taking gabapentin regularly because it made her feel funny.  (*Id*.)  She had not gotten x-rays of her knees or foot.  (*Id*.)  CNS Harrington made general observations on examination, noting that Ms. Pond was pleasant, healthy, alert, and oriented.  (Tr. 1146.)  She did not record more specific examination findings. (*Id*.)  CNS Harrington discontinued Flexeril, noted that Ms. Pond had stopped taking gabapentin, continued Cymbalta and Lodine, and recommended weight loss.  (Tr. 1147.)

Ms. Pond presented to her family physician Simranjit Gill, D.O., on December 2, 2016, for follow up after undergoing a surgical procedure recommended by her gynecologist.  (Tr. 1248.)  She complained of general weakness, tiredness, and shortness of breath.  (*Id*.) Examination revealed 5/5 motor strength in her bilateral extremities.  (Tr. 1249.)  Ms. Pond's diagnoses included fatigue, unspecified type.  (*Id*.)

When Ms. Pond returned to CNS Harrington on December 7, 2016, she reported that Cymbalta helped with her pain, but made her moody, and that Flexeril helped with her pain. (Tr. 1261.)  CNS Harrington again did not record specific physical examination findings.  (Tr. 1263.) She recommended weight loss, started Ms. Pond on Tramadol, and noted that they would consider restarting Flexeril in the future.  (Tr. 1264.)

When Ms. Pond returned to CNS Harrington on January 11, 2017, she reported that Tramadol was helping if she took the full dose at night, but she was stiff in the morning.  (Tr. 1283.)  She was taking Flexeril as needed.  (*Id*.)  CNS Harrington did not record specific physical examination findings.  (Tr. 1286.)  She recommended weight loss, increased Tramadol, refilled Lodine, and continued Flexeril.  (*Id*.)

Ms. Pond returned to CNS Harrington on May 17, 2017.  (Tr. 1654.)  She complained of deep and aching bilateral shoulder pain at night.  (*Id*.)  She also complained of right knee pain with popping and cracking over the patella.  (*Id*.)  Examination of the shoulders revealed tenderness over the superior shoulder and some reduced range of motion, but full strength with flexion, abduction, and internal/external rotation.  (Tr. 1657.)  There was no warmth, swelling, or tenderness in the right knee, but there was reduced range of motion and positive patellar grind.  (*Id*.)  CNS Harrington recommended weight loss and knee exercises.  (Tr. 1658.)  She administered bursa injections in the shoulders bilaterally and continued Ms. Pond's medications with an increase in Tramadol.  (*Id*.)

When Ms. Pond returned to CNS Harrington on July 20, 2017, she reported tingling in her hands and feet, a likely side effect of Topamax.  (Tr. 1743.)  She said her shoulders still hurt and she had pain throughout her spine and along her waist band.  (*Id*.)  She reported losing sixty-five pounds.  (*Id*.)  Examination findings were unchanged from the May 2017 visit.  (*Compare* Tr. 1746 *with* Tr. 1657-68.)  Bilateral shoulder bursitis was an added condition.  (Tr. 1741, 1746.)  CNS Harrington recommended weight loss and a consult at the pain clinic for Lidocaine infusions, continued her medications, and discussed aqua therapy and yoga.  (Tr. 1747.)

Ms. Pond returned to CNS Harrington on September 21, 2017, reporting that her pain was stable, but that her shoulders were the most painful, especially at night.  (Tr. 1807-08.)  She

8

said injections had helped for one day.  (*Id*.)  She also reported that her weight was down seventy pounds, she was on a waiting list for a Lidocaine infusion, and she was taking Flexeril and Tramadol, but was no longer taking Lodine.  (*Id*.)  Examination of her bilateral shoulders revealed tenderness over the superior shoulder and severely reduced range of motion and positive provocative maneuvers.  (Tr. 1811.)  CNS Harrington administered bursa injections in the shoulders bilaterally and recommended physical therapy for her shoulders.  (*Id*.)

When Ms. Pond saw CNS Harrington on November 16, 2017, she reported pain in her shoulders, spine, and waist, but also reported that her pain was stable.  (Tr. 1878-79.)  She also reported tingling in her hands and feet, likely a side-effect of Topamax.  (Tr. 1878.)  She was still on a waiting listing for Lidocaine infusions.  (Tr. 1879.)  She was taking Flexeril and Tramadol. (*Id*.)  A November 16, 2017 right shoulder x-ray was normal.  (Tr. 1881, 1923.)  A left shoulder x-ray taken that same day revealed calcification at the level of the coracoid process that was consistent with synovial osteochondromatosis.  (Tr. 1881-82, 1923.)  Examination of the left shoulder revealed tenderness and reduced range of motion.  (Tr. 1882.)

Ms. Pond presented to orthopedist Stephen Cheng, M.D., at MetroHealth on January 19, 2018, regarding her bilateral shoulder pain.  (Tr. 1921.)  Examination of the shoulders revealed no swelling or warmth, but tenderness and reduced range of motion and strength.  (Tr. 1923-24.)  Dr. Cheng noted that Ms. Pond "actively resist[ed] examination and elevation" and did "not exhibit good pain coping skills."  (Tr. 1924.)  Dr. Cheng assessed bilateral shoulder pain, impingement.  (*Id*.)  He recommended conservative management, indicating that there were "no current indications for surgery."  (*Id*.)

Ms. Pond returned to CNS Harrington on May 17, 2018, for follow up and refills of her medication.  (Tr. 1977, 1980.)  She reported that her back pain was flaring up, and was worse

with activity but better with rest.  (Tr. 1980.)  She was interested in injections.  (*Id*.)  An examination of the left shoulder was performed, revealing tenderness and reduced range of motion.  (Tr. 1983.)  CNS Harrington continued to recommend Lidocaine infusions and also recommended interlaminar injections bilaterally at the L5-1 level.  (Tr. 1984.)

Ms. Pond presented for pain management infusion therapy at MetroHealth on August 16, 2018, for a Ketamine, Lidocaine, and Propofol infusion.  (Tr. 2008-09.)  She tolerated the procedure well and was discharged home in stable condition.  (Tr. 2009.)

Ms. Pond returned to CNS Harrington on September 19, 2018.  (Tr. 2060.)  She reported swelling and pain in her left foot and pain in her big toe that left her unable to walk.  (Tr. 2060, 2063, 2066.)  She said the swelling eventually went down and she was able to walk on her foot again after taking a family member's pain pill and sleeping for a day.  (Tr. 2063.)  She reported that her back pain continued.  (*Id*.)  She had missed her back injection.  (*Id*.)  She said the Lidocaine infusion helped significantly.  (*Id*.)  An examination of the left ankle was performed.  (Tr. 2066.)  The findings were unremarkable.  (*Id*.)  CNS Harrington's recommendations included to x-ray the left foot and referral to a podiatrist.  (Tr. 2067.)  The left-foot x-ray revealed a small plantar calcaneal spur and Achilles calcifications.  (Tr. 2078.)

Ms. Pond presented to Chong Kim, M.D., for an epidural steroid injection at the L5-S1 on October 3, 2018.  (Tr. 2102-03.)  She tolerated the procedure well.  (Tr. 2103.)

Ms. Pond returned to her primary care physician Dr. Abou-Haidar on November 15, 2018, complaining of general swelling, muscle fatigue, right shoulder pain, and low back pain radiating into her legs.  (Tr. 2139.)  Ms. Pond's diagnoses included: fibromyalgia; lumbosacral spondylosis without myelopathy; essential hypertension; and migraine without aura and without status migrainosus, not intractable.  (Tr. 2141.)  In relation to her fibromyalgia diagnosis, Dr.

Abou-Haidar noted that Ms. Pond was morbidly obese, not exercising, and taking Tramadol and Flexeril.  (*Id*.)  Ms. Pond expressed interest in speaking with the arthritis clinic to rule out rheumatological disease.  (*Id*.)

Ms. Pond presented to podiatrist Lisa Roth, DPM, at MetroHealth on November 28, 2018, for a consultation regarding her complaints of left foot pain.  (Tr. 2148.)  Examination of the left foot was normal overall with the exception of reactive bone / periosteal reaction along the lateral aspect of the proximal fifth metatarsal, posterior heel spur/calcification, and the presence of some hammertoes.  (Tr. 2149.)  Dr. Roth informed Ms. Pond that her left foot was "normal clinically and by radiographs"; she was uncertain of the cause of Ms. Pond's pain, but thought it might be related to her fibromyalgia.  (*Id*.)

Ms. Pond presented to Marina Magrey, M.D., a rheumatologist at MetroHealth on December 5, 2018, for evaluation of chronic pain.  (Tr. 2153, 2159.)  Dr. Magrey observed the following on examination: full range of motion without pain or tenderness in the neck, left shoulder, elbows, wrists, knees, and ankles; no swelling in the knees or ankles; 5/5 hand grip; no tenderness in lateral hips or toes; and no swelling or tenderness in the MCP, PIP, and DIP joints. (Tr. 2157.)  Dr. Magrey also observed: limited range of motion in the right shoulder due to pain; low back tenderness to palpation; and bilateral knee crepitus.  (*Id*.)  Dr. Magrey found no evidence on examination to suggest inflammatory arthritis or a connective tissue disease and felt that the "most likely etiology of her chronic pain" was fibromyalgia.  (Tr. 2159.)  Dr. Magrey recommended physical therapy and ibuprofen for Ms. Pond's shoulder pain, and possibly a steroid injection.  (*Id*.)  For Ms. Pond's fibromyalgia and back pain, Dr. Magrey recommended that she continue her medications and continue to follow with pain management.  (*Id*.)  Dr. Magrey also recommended an autoimmune panel.  (*Id*.)

11

Ms. Pond returned to CNS Harrington on February 6, 2019.  (Tr. 2242.)  She reported that she was applying for disability because she could no longer work.  (Tr. 2244.)  She said she was able to lift less than ten pounds and stand, walk, and sit for a few minutes.  (*Id*.)  CNS Harrington's examination of Ms. Pond's lumbar spine revealed normal strength, intact sensation to light touch, and normal reflexes in the lower extremities bilaterally.  (Tr. 2247.)  She was able to stand on her toes and heels.  (*Id*.)  Ms. Pond had lost eighty pounds.  (*Id*.)  CNS Harrington recommended that Ms. Pond continue with her medications and continue to work on weight loss.  (*Id*.)  CNS Harrington completed disability paperwork.  (Tr. 2247, 2178-79.)

Ms. Pond presented for a Ketamine, Lidocaine, and Propofol infusion on May 7, 2019.  (Tr. 2227-28.)  She reported the prior infusion "provided an overall 30% improvement in pain for 3 weeks."  (Tr. 2228.)  She tolerated the procedure well.  (*Id*.)

Ms. Pond returned to CNS Harrington on July 10, 2019.  (Tr. 2917.)  She reported that Tramadol continued to work and her symptoms were stable, but that her back pain continued and she had new pain bilaterally at the base of her thumbs.  (Tr. 2918.)  She reported that she was "[l]earning how to live [with] the pain."  (*Id*.)  Her lumbar spine examination findings were unchanged from her February visit.  (*Compare* Tr. 2923 *with* Tr. 2247.)

Ms. Pond presented to the emergency room at MetroHealth on July 28, 2019, reporting pain and swelling in her left foot that started three days earlier.  (Tr. 2910-11.)  She rated her pain 10/10.  (Tr. 2911.)  Examination revealed mild swelling and tenderness in the left foot.  (Tr. 2912.)  Ms. Pond was able to move all four extremities.  (*Id*.)  She was alert and in no distress.  (*Id*.)  An x-ray of the left foot revealed the calcaneal spur and ossification of the distal Achilles, but no acute fracture or dislocation.  (Tr. 2913, 3773-74.)  She was diagnosed with left foot pain and prescribed hydrocodone-acetaminophen.  (Tr. 2913.)

12

Ms. Pond received additional Lidocaine, Ketamine, and Propofol infusions on August 20, 2019, September 19, 2019, and October 10, 2019.  (Tr. 2967, 3384-85.)  She reported relief from the infusions (Tr. 2968, 3383), but when she returned for infusions, she reported her pain level ranged from 8/10 to 10/10. (Tr. 2968, 3384).

Ms. Pond presented to the emergency room at South Pointe Hospital on October 13, 2019, for right foot and heel pain.  (Tr. 2182.)  She said her pain started as a mild ache the day before, but had worsened and she could not put weight on it.  (*Id*.)  She was treated with Percocet, Prednisone, and Aspercreme.  (Tr. 2184.)  She was also given an orthopedic shoe/boot and a walker and instructed to follow up with her primary care physician or podiatrist.  (*Id*.)

Ms. Pond returned to CNS Harrington on December 11, 2019.  (Tr. 3453.)  She reported foot pain in September, which resolved a week later after seeking treatment at the emergency room.  (Tr. 3453.)  She also reported severe knee pain in November, but said it resolved on its own within three days.  (Tr. 3454.)  She said the pain came and went.  (*Id*.)  Ms. Pond's lumbar spine examination continued to reveal normal strength and reflexes and intact sensation in the bilateral lower extremities, and she was able to stand on her toes and heels.  (Tr. 3461.)

Ms. Pond had infusions on January 30, 2020, and February 27, 2020.  (Tr. 3503-05, 3608.)  At her January infusion appointment, she reported her prior infusion provided 30% pain relief for two to three weeks.  (Tr. 3503.)  At her February infusion appointment, she reported the January infusion provided 50% pain relief for one week.  (Tr. 3608.)

Migraine Headaches and Anemia

Ms. Pond received treatment during the relevant period for chronic migraine headaches. (Tr. 715, 725, 894, 896, 911-12, 950, 1324, 1408, 1415, 2184, 2186, 3512-13, 3515, 3524-28.)

She also received treatment for anemia during this period.  (Tr. 672-73, 1345, 1372, 1380, 1564, 1889, 2018, 2053, 2123, 2236, 2241, 2927-98, 2971, 3675, 3706.)

In 2015, she was prescribed Imitrex to treat her migraines.  (Tr. 716.)  In early January 2016, she reported to neurologist Marc Winkelman, M.D., that her headaches were occurring three times a week and lasted all day.  (Tr. 894.)  She reported that Imitrex was working more than fifty percent of the time, but that her headaches were more frequent since her primary care doctor had stopped Elavil.  (Tr. 894, 896.)  Dr. Winkelman increased her Imitrex dose and also increased another medication, Inderal.  (Tr. 896.)  On February 18, 2016, Ms. Pond presented to the MetroHealth emergency room, complaining of the worst headache she had ever had.  (Tr. 911.)  She reported that her headache had been ongoing for three days, and the pain was sharp, achy, and diffuse throughout her head.  (Tr. 911-12.)  Her physical examination was normal. (Tr. 912.)  Ms. Pond's symptoms improved following administration of IV and oral medication and she was discharged.  (Tr. 912.)

A few months later, on April 1, 2016, Ms. Pond was admitted to the hospital by her neurologist for status migrainosus after she had failed three courses of steroids over the prior two month period.  (Tr. 950-52.)  Her headache resolved with medication and vigorous IV hydration. (Tr. 952.)  She was discharged on April 4, 2016.  (Tr. 950.)

Ms. Pond was then admitted to MetroHealth on August 28, 2016, and later transferred to University Hospitals for status migrainosus.  (Tr. 672-73.)  She reported that her headache had been present for two weeks and she was experiencing light headedness, dizziness, presyncope, and blurred vision bilaterally.  (Tr. 672.)  She was transferred to University Hospitals due to a shortage of DHE (dihydroergotamine), a medication used to treat her headache.  (*Id*.)  An August 31, 2016 CT scan of the head showed no abnormality and an August 31, 2016 chest x-ray

showed no evidence of acute pulmonary process.  (Tr. 684.)  Ms. Pond's headaches slowly

improved with medication.  (Tr. 672.)  Blood work showed that Ms. Pond was anemic.  (*Id*.) She

received an infusion of red blood cells and she saw hematology for a consult regarding anemia.

(Tr. 672-73, 675-78.)  She was diagnosed with iron deficiency anemia secondary to

gynecological etiology.  (Tr. 678.)  She was discharged on September 4, 2016.  (Tr. 672.)

When Ms. Pond returned for follow up with Dr. Winkelman on January 20, 2017, she

reported her headaches were occurring once or twice per month.  (Tr. 1324.)  Dr. Winkelman

noted that she was doing well and continued her headache medications.  (Tr. 1326.)

Ms. Pond presented to Karen Peereboom, CNP, at MetroHealth on February 6, 2017, for

a hematology consult for evaluation of her iron deficiency anemia.  (Tr. 1345.)  CNP Peereboom

recommended iron supplementation and management of menorrhagia.  (Tr. 1349.)  Ms. Pond

returned to CNP Peereboom on February 21, 2017, for follow up regarding her anemia.  (Tr.

1380.)  She opted to take iron supplements rather than undergo an IV iron infusion.  (Tr. 1384.)

On February 21, 2017, Ms. Pond reported to her ophthalmologist that her headaches were

improving with Topamax.  (Tr. 1408.)  However, she returned to the emergency room on March

19, 2017, complaining of a left-sided headache that had been ongoing for three weeks.  (Tr.

1415.)  Symptoms included nausea and tingling in her hands and feet.  (*Id*.)  Examination

findings were normal.  (Tr. 1417.)  She was admitted with a principal diagnosis of status

migrainosus and a secondary diagnosis of iron deficiency thought to be due to chronic

mennorrhagia.  (Tr. 1420.)  Her condition was improved on discharge, on March 24, 2017.  (*Id*.)

When Ms. Pond returned to CNP Peereboom for follow up on April 24, 2017, she

reported that she had been taking her iron supplements, but occasionally missed a dose.  (Tr.

1564.)  She reported feeling fatigued and short of breath and was interested in proceeding with

iron infusions. (Tr. 1564.) Her first iron infusion was administered at MetroHealth on April 27, 2017. (Tr. 1568, 1585.) She received another infusion on August 3, 2017. (Tr. 1889.)

Ms. Pond continued to receive iron infusions throughout 2018 and 2019. (Tr. 1893, 1933, 1936, 2018, 2120, 2236, 2927-28, 2971.) She tolerated them well, but reported feeling more tired in October 2018 (Tr. 2120) and reported fatigue on February 7, 2019 (Tr. 2240).

Ms. Pond presented to the emergency room at South Pointe Hospital on April 11, 2019, with complaints of a cough, headache, and dizziness. (Tr. 2184.) She reported her headache was similar to previous migraines and her medication had not helped. (*Id*.) There was some improvement in her headache after she was treated with IV fluids. (Tr. 2186.) She also received steroids and antibiotics. (*Id*.) She was discharged in stable condition. (*Id*.)

Ms. Pond continued to complain of headaches/migraines in 2020. (Tr. 3513.) Her prescription for Topamax was increased on January 31, 2020, and her prescriptions for Propranolol and Maxalt were continued. (Tr. 3515.) On February 20, 2020, Ms. Pond presented to the emergency room at MetroHealth, complaining of a migraine that she had been having for more than a week. (Tr. 3524-25.) She reported taking her migraine medication as prescribed. (Tr. 3525.) She was diagnosed with "other migraine without status migrainosus, not intractable." (Tr. 3528.) Her symptoms improved following administration of IV and oral medications and she was discharged the same day in stable condition. (Tr. 3527-28.) She continued to follow up regarding her iron deficiency anemia in 2020, receiving iron infusions in January 2020 (Tr. 3675) and April 2020 (Tr. 3706).

### ii.    Mental Health Impairments

During a May 9, 2017 appointment with her primary care physician Dr. Abou-Haidar, Ms. Pond reported that she felt "depressed and tired" and was "in pain from her regular

16

fibromyalgia." (Tr. 1644.)  She was diagnosed with mild depression.  (Tr. 1647.)  Ms. Pond was

agreeable to counseling and a psychology consult was recommended.  (*Id*.)

Ms. Pond presented to Michael Allen, LPCC, at MetroHealth on June 5, 2017, for a

mental health assessment.  (Tr. 1667.)  She reported feeling sad, tearful, unmotivated, and

anxious.  (*Id*.)  She said she could have at least two panic attacks a week, reporting she could not

be in small spaces and had to avoid crowded spaces.  (Tr. 1667, 1668.)  She also said she had

depressive symptoms for ten years, worsening over time.  (*Id*.)  She had raised four children,

now adults, and had two grandchildren and fourteen nieces and nephews; she said she "had to

put her own needs on hold while helping others."  (Tr. 1667.)  On mental status examination, Ms.

Pond was adequately groomed, oriented, and cooperative.  (Tr. 1670.)  Additional mental status

examination findings included: sustained concentration, euthymic mood, congruent affect, clear

speech with normal rate and flow, logical and organized thoughts, normal thought content, and

good insight/judgment.  (*Id*.)  LPCC Allen recommended counseling.  (Tr. 1671.)

Ms. Pond returned to LPCC Allen on June 12, 2017, for counseling.  (Tr. 1695.)  She

reported feeling depressed when thinking about her life and felt her adult children relied on her

too much.  (*Id*.)  Ms. Pond was well groomed, oriented, and cooperative, but anxious with a

dysphoric mood and constricted affect. (Tr. 1696.)  Additional mental status examination

findings included: spontaneous speech with normal rate and flow, logical and organized

thoughts, tight associations, no psychotic thoughts, good insight/judgment, normal memory,

sustained attention and concentration, and appropriate knowledge.  (*Id*.)

When Ms. Pond returned to LPCC Allen for counseling on July 20, 2017, she reported

her adult children demanded a lot from her and she felt her family took advantage of her. (Tr.

1751.)  On examination, she was well groomed, oriented, and cooperative, with logical and

organized thoughts, normal memory, sustained attention and concentration, good judgment, fair insight, and appropriate language, but she was also restless and anxious with a dysphoric mood and constricted affect.  (Tr. 1752.)

Ms. Pond returned to Dr. Abou-Haidar on August 8, 2017, for follow up regarding multiple medical conditions.  (Tr. 1776.)  Ms. Pond reported that she had been seeing LPCC Allen for counseling, but "remain[ed] pretty depressed and had several panic attacks."  (*Id*.)  She agreed to try an antidepressant.  (*Id*.)  No mental status examination findings were recorded.  Dr. Abou-Haidar diagnosed panic disorder with agoraphobia and prescribed Lexapro.  (Tr. 1779.)

Ms. Pond returned to Dr. Abou-Haidar on September 21, 2017, reporting that Lexapro seemed to help with her anxiety, but that she wanted to increase the dose.  (Tr. 1798.)  Although she reported continuing to see LPCC Allen for counseling (Tr. 1798), neither party cites further records with LPCC Allen.  Dr. Abou-Haidar diagnosed depressive disorder and panic disorder with agoraphobia, and increased Ms. Pond's Lexapro dose.   (Tr. 1800.)

Two years later, at a follow-up appointment with Dr. Abou-Haidar on September 5, 2019, Ms. Pond reported that she had been feeling depressed for a few months, but she did not know why and she could not identify new stressors.  (Tr. 2969.)  She had been taking Lexapro for a year and a half.  (*Id*.)  No mental status examination findings were recorded.  Ms. Pond was diagnosed with moderate episode of recurrent major depressive disorder.  (Tr. 2970.)  Dr. Abou-Haidar added Wellbutrin and made a psychiatry referral.  (*Id*.)

Ms. Pond attended a mental health assessment with Bethany Bock, LISW, at MetroHealth on January 27, 2020.  (Tr. 3491.)  She reported that things had been getting worse for few months.  (*Id*.)  She said she was unable to ride the bus and could not be in small spaces.  (*Id*.)  She reported depression, anxiety, and past trauma.  (Tr. 3492.)  She also reported memory

problems related to her fibromyalgia.  (*Id*.)  On examination, she was anxious, sad, and tearful with an incongruent mood, but was also well groomed, oriented, and cooperative with sustained concentration, clear speech, normal cognition, logical thoughts, and good insight and judgment. (Tr. 3495-96.)  Ms. Pond expressed interest in medication management and therapy.  (Tr. 3496.)

Ms. Pond saw Stacey Caldwell, Ph.D, at MetroHealth on April 14, 2020, for a telehealth behavioral health counseling and therapy session.  (Tr. 3698.)  She reported living with her father, feeling lonely or anxious when home alone, feeling trapped when in small spaces, and having meltdowns two or three times a day.  (*Id*.)  She was calm on examination and had spontaneous speech with a normal rate and flow.  (Tr. 3699.)  Her thoughts were logical and organized with tight associations.  (*Id*.)  Her judgment and insight were good.  (*Id*.)  She had sustained attention and concentration and normal memory.  (Tr. 3700.)  Dr. Caldwell recommended that Ms. Pond schedule a follow-up counseling appointment and track her mood and thoughts in a journal.  (Tr. 3700.)

## 2.    Opinion Evidence

### i.    Treating Source

On February 6, 2019, CNS Harrington completed a Medical Source Statement regarding Ms. Pond's physical capacity, opining that Ms. Pond's impairments limited her functional abilities.  (Tr. 2178-79.)  Specifically, she opined that Ms. Pond was limited to: lifting/carrying nine pounds occasionally; lifting/carrying five pounds frequently; standing/walking or sitting for a total of forty minutes in an eight-hour workday; standing/walking or sitting for ten minutes without interruption; rarely climbing, balancing, stooping, crouching, kneeling, or crawling; and rarely reaching, pushing/pulling, or performing fine and gross manipulation.  (*Id*.)  CNS Harrington also opined that Ms. Pond had environmental restrictions, including heights, moving

machinery, temperature extremes, pulmonary irritants, and noise.  (Tr. 2179.)  CNS Harrington

indicated that Ms. Pond was prescribed a cane, brace, and TENS unit.  (*Id*.)  CNS Harrington

also rated Ms. Pond's pain as severe and opined that her pain would interfere with concentration,

take her off task, and cause absenteeism.  (*Id*.)  She also opined that Ms. Pond would need: the

ability to alternate positions between sitting, standing, and walking at will; additional

unscheduled rest periods outside of the normal break and lunch periods; and several hours of

additional rest time on an average day.  (*Id*.)  CNS Harrington noted that her opinions were

supported by "history and examination."  (Tr. 2178-79.)  She also added that Ms. Pond had iron

deficiency anemia, asthma, and fibromyalgia that was not responsive to treatment.  (Tr. 2179.)

### ii.      State Agency Reviewing Medical Consultants

State agency reviewing medical consultant Gerald Klyop, M.D., completed a Physical

RFC Assessment on September 7, 2019.  (Tr. 420-22.)  Dr. Klyop opined that Ms. Pond had the

physical residual capacity to: lift and/or carry twenty pounds occasionally; lift and/or carry ten

pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about

six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally crawl,

crouch, kneel, stoop, and climb ramps or stairs; and avoid all exposure to hazards, including

machinery, unprotected heights, and commercial driving.  (*Id*.)

State agency reviewing medical consultant Steve McKee, M.D., completed a Physical

RFC Assessment on December 15, 2019.  (Tr. 449-51.)  Dr. McKee agreed with Dr. Kylop's

prior administrative medical findings.  (*Id*.)

### iii.      State Agency Reviewing Psychological Consultants

State agency reviewing psychological consultant Robyn Murry-Hoffman, Ph.D.,

completed a Psychiatric Review Technique ("PRT") on September 9, 2019.  (Tr. 418-19.)  Dr.

20

Murry-Hoffman opined that Ms. Pond had *no limitations* in understanding, remembering, or applying information or interacting with others and *mild limitations* in concentrating, persisting, or maintaining pace or adapting or managing herself.  (Tr. 418.)  Dr. Murry-Hoffman further opined that there was no evidence a severe psychological impairment.  (Tr. 419.)

State agency reviewing psychological consultant Paul Tangeman, Ph.D., completed a PRT at the reconsideration level on December 6, 2019.  (Tr. 446-48.)  He agreed with Dr. Murry-Hoffman's opinion that there was no evidence of a severe psychological impairment.  (*Id*.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Ms. Pond testified in response to questioning by the ALJ and her representative at the July 29, 2020 telephonic hearing.  (Tr. 51-60.)  She said she stopped working in 2015 because she started to have stiffness and excruciating pain when standing up after sitting and had a burning sensation in her lower back.  (Tr. 53.)  When she got home from work, she said she had to "drag" herself upstairs to take a shower and went to bed in a lot of pain.  (*Id*.)  She said that her pain had gotten worse since 2015.  (Tr. 53-54.)  She reported pain in her hands, arms, and shoulders that made it very difficult for her to wash her hair or hold her arms up long enough to blow dry her hair, and said her daughter often helped with her hair.  (Tr. 54.)  She said her upper extremity pain was due to bursitis in her shoulder, osteoarthritis in her hands, and fibromyalgia. (*Id*.)  She had the most pain in her lower back, shoulders, and left leg.  (Tr. 58.)

Ms. Pond was hospitalized in February 2020 for a migraine.  (Tr. 57.)  She explained that she did not get really bad migraines as often as in the past, but had a "normal" migraine once or twice every two weeks.  (*Id*.)  She said she was nauseous and could not deal with regular levels of light during a migraine, and had to wear sunglasses and lie still in a quiet room.  (*Id*.)

Ms. Pond said she was diagnosed with depressive disorder and anxiety. (Tr. 55.) She said she had always been depressed, had experienced things in life that caused PTSD, and had anxiety and a fear of being in closed places. (*Id*.) She reported talking only to her family—including her four children, her dad, and grandchild—and her best friend. (Tr. 59-60.)

Ms. Pond said she treated her pain with a lot of prescriptions, which caused sleepiness and drowsiness. (Tr. 54-55.) She also said the medicine she took to treat her migraines and anxiety made her drowsy. (Tr. 55-56.) She reported taking at least two naps a day. (Tr. 56.) Other reported medication side effects included dry mouth, brittle hair, and a frequent need to use the restroom. (Tr. 60.) Ms. Pond also reported having infusions to treat her pain. (Tr. 58.) She said her infusions knocked her pain down from "past a ten" (out of ten) to about eight out of ten for five or six days, which was "good for [her]" and gave her a "nice feel." (*Id*.) However, she had not been receiving her infusions due to Covid-19 social distancing protocols. (*Id*.)

Ms. Pond testified that standing and sitting for long periods made her pain worse, so she had to alternate between sitting, lying down, and walking. (Tr. 58-59.) She could not walk far and had to use a riding cart in the grocery store. (Tr. 59.) She could sit for about six minutes before her pain would start to shoot down her back into her lower legs, and could stand for two to three minutes before needing to change positions. (*Id*.) She said the most walking she usually did was from her house to her car. (*Id*.) She also reported that her memory was poor and she often forgot things, calling it "fibro fog." (Tr. 60.)

**2.     Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing. (Tr. 61-63.) The VE classified Ms. Pond's past work as that of a kitchen supervisor, a skilled medium exertional job that she

performed at the medium level, and a fast-food services manager, a skilled light exertional job that she performed at the medium level.  (Tr. 61.)

For his first hypothetical, the ALJ asked the VE whether an individual of Ms. Pond's age, education, and work experience would be able to perform Ms. Pond's past work if the individual was limited as follows:

> limited to light work as defined by the regulations.  Further limited to no climbing of ladders, ropes or scaffolds.  Occasional climbing of ramps and stairs.  Occasional stooping, kneeling, crouching and crawling.  Avoid all exposure to unprotected heights, performing any commercial driving or working around dangerous machinery . . . further limited to performing simple tasks and following simple instructions with few, if any, workplace changes.  No strict production quotas, i.e., assembly line work.

(Tr. 61.)  In response, the VE testified that the individual would not be able to perform Ms. Pond's past work, but there would be other jobs in the national economy that the individual could perform, including office helper, inspector, and garment sorter.  (Tr. 62.)

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical with the additional limitations of: being off task more than 20% of the workday and missing or being unable to complete two or more workdays per month.  (Tr. 62.)  The VE testified that there would be no jobs available for an individual with those additional limitations.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

23

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his October 1, 2020, decision the ALJ made the following findings:[2]

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2020.  (Tr. 28.)

2.    The claimant has not engaged in substantial gainful activity since January 1, 2015, the alleged onset date.  (*Id*.)

3.    The claimant has the following severe impairments: obesity, anemia, deep vein thrombosis, fibromyalgia, lumbar spine disorder, and migraine headaches.  (*Id*.)  The claimant had other physical impairments that were non-severe, including hypertension, hyperlipidemia, and pseudotumor cerebri.  (Tr. 29.)  The claimant's mental health impairments of major depressive disorder and anxiety with agoraphobia were non-severe.  (Tr. 29-31.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 31-32.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; avoid all exposure to unprotected heights, performing any commercial driving or working around dangerous machinery; further limited to performing simple tasks and following simple instructions with few if any workplace changes, and no strict production quotas, i.e., assembly line work.  (Tr. 32-37.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 37-38.)

7.    The claimant was born in 1974 and 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (Tr. 38.)

8.    The claimant has at least a high school education.  (*Id*.)

9.    Transferability of job skills is not material to the determination of disability.  (*Id*.)

---

[2] The ALJ's findings are summarized.

10.     Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including office helper, inspector, and garment sorter.  (Tr. 38-39.)

Based on the foregoing, the ALJ determined that Ms. Pond had not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of the decision.  (Tr. 39.)

## V.     Plaintiff's Arguments

Ms. Pond presents two issues for review.  (ECF Doc. 9.)  First, she argues that the ALJ erred by finding no severe mental health impairments.  (*Id*. at pp. 1, 16-18.)  Second, she argues that the ALJ erred when he rejected the opinion of CNS Harrington.  (*Id*. at pp. 1, 18-22.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**      **First Assignment of Error: Whether ALJ Erred at Step Two**

In her first assignment of error, Ms. Pond argues that the ALJ erred by finding no severe mental health impairments at Step Two.  (*Id.* at pp. 1, 16-18.)  She contends she was "diagnosed with, and impaired by, multiple mental health conditions" and argues the ALJ's "erroneous

finding led to Ms. Pond being assigned a residual functional capacity that did not incorporate any mental functional limitations." (*Id*. at p. 16.)  She also argues that the ALJ erred at Step Two because he relied on outdated state agency medical opinions and should have developed the record by ordering a consultative mental health examination.  (*Id*. at pp. 17-18.)

### 1.    Whether ALJ Erred in Finding Mental Impairments Were Nonsevere

The Court first turns to Ms. Pond's argument that the ALJ committed reversible error when he found that her mental impairments were nonsevere.

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."[3]  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330–32 (6th Cir. 2001).

In evaluating a mental impairment, an ALJ must rate the claimant's degree of functional limitation in four broad areas of mental functioning using a five-point scale including: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c), (e)(4).  The four broad areas of mental functioning are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(4).  "The four broad functional areas are also commonly referred to as the

---

[3] Being able to do basic work activities, means having "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  (*Id.*)

'paragraph B' criteria."  *Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *9 (N.D. Ohio Sept. 21, 2021) (citation omitted).  If a claimant's degree of limitation is rated "as 'none' or 'mild,'" the conclusion will generally be that a claimant's "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is de minimis, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

Where an ALJ has identified both severe and nonsevere impairments, the Sixth Circuit has held that it was not reversible error for an ALJ to find impairments nonsevere where the Commissioner could consider the nonsevere impairments in assessing the RFC.  *See Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony*, 266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed severe where the designation of other impairments as severe "cleared step two of the analysis" and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003)

(finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

In contrast, the Sixth Circuit has indicated it may be reversible error if an ALJ fails to consider nonsevere impairments in assessing the RFC.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190–191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a nonsevere mental impairment "would not be considered in assessing her RFC"); *Dudley v. Comm'r of Soc. Sec.,* No. 2:16-CV-0682, 2017 WL 2374432, at *4 (S.D. Ohio June 1, 2017) (finding error was not harmless when mental impairments were found nonsevere and the ALJ "did not take any mental impairments or limitations into account" in the RFC), *report and recommendation adopted*, No. 2:16-CV-682, 2017 WL 2645962 (S.D. Ohio June 20, 2017); *compare Pompa,* 73 F. App'x at 803 (applying harmless error standard where "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment finding").

Ms. Pond contends that her depression, anxiety, panic, and agoraphobia affected her ability to work more than minimally, and that the ALJ therefore erred when he found no severe mental impairments.  (*Id*. at pp. 16-17.)  The ALJ did find Ms. Pond's mental impairments were nonsevere, but also found certain physical impairments were severe. (Tr. 28-31.)  In support of these findings, the ALJ identified Ms. Pond's medically determinable mental impairments, discussed her subjective complaints relevant to each area of mental functioning, described the related observations and clinical findings of her treatment providers (Tr. 29-30), and concluded that her "mental impairments of major depressive disorder and anxiety with agoraphobia . . . [did] not cause more than minimal limitation in [] [her] ability to perform basic mental work activities" (Tr. 29).  In further support of this finding, the ALJ discussed and found persuasive the findings of the state agency psychological consultants that Ms. Pond had no more than mild

limitations in all four areas of mental functioning.  (Tr. 30.)  In particular, he observed that "the assessment of no more than mild limitations in the four broad areas of mental functioning is supported by objective findings of calm demeanor, cooperative attitude, logical thought process, normal memory, no distress and sustained concentration."  (Tr. 30-31 (citations omitted).)

Although the ALJ found Ms. Pond's mental impairments were nonsevere, his written decision reflects that he "considered all . . . medically determinable impairments, including those that are not severe, when assessing [] [Ms. Pond's] residual functional capacity" (Tr. 29). Moreover, contrary to Ms. Pond's assertion that the ALJ failed to "incorporate any mental functional limitations" in the RFC (ECF Doc. 9, p. 16), the ALJ did include mental functional limitations in the RFC (Tr. 32).  Specifically, he limited Ms. Pond to "performing simple tasks and following simple instructions with few if any workplace changes, and no strict production quotas, i.e. assembly line work."  (*Id*.)  He explained that these limitations were "dictated" by "the combined effects of the signs and symptoms from *all of her impairments*, including pain from her physical impairments, side effects from her medications, and decreased ability to concentrate."  (Tr. 37 (emphasis added).)

Because the ALJ concluded that the evidence did not support more than a minimal limitation in Ms. Pond's ability to perform basic mental work activities (Tr. 29), considered all severe and nonsevere impairments in assessing the RFC (*id.*), and adopted an RFC with mental limitations based on "all of her impairments" (Tr. 32, 37), the Court finds no reversible error in the ALJ's finding that Ms. Pond's mental impairments were nonsevere.

The Court additionally finds that the ALJ's Step Two finding has the support of substantial evidence.  As noted above, a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863.  Here, although Ms. Pond was diagnosed with mental

impairments, the records reveal that her treatment for those conditions was limited and sporadic. While she received some counseling in 2017, she did not return to counseling until 2020.  The ALJ acknowledged Ms. Pond's subjective reports of difficulty being around others, problems with memory, task completion, and anxiety, but also observed that her treatment notes reflected no difficulty getting along with others and her mental status examinations revealed that she had logical thought process, normal memory, and normal concentration and attention.  (Tr. 29-30, 1670, 1696, 1752, 3495-96, 3699-70.)  She was adequately or well groomed, alert, and cooperative.  (*Id*.)  The ALJ also considered the opinions of the state agency psychological consultants, who found no evidence of severe psychological impairments.  (Tr. 30-31, 418-19, 446-48.)  These findings supply substantial evidence to support the ALJ's Step Two findings.

Ms. Pond contends that her mental impairments are more severe than the ALJ found them to be.  However, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (internal citation omitted).  Thus, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Given the record before the ALJ, the Court cannot conclude that the ALJ's Step Two finding lacks the support of substantial evidence.

### 2.    Whether ALJ Erred by Not Obtaining a Consultative Examination

The Court next turns to Ms. Pond's argument that the ALJ erred because he relied on "outdated" state agency psychological consultant opinions when he should have requested a consultative psychological examination.  The Court finds this argument lacks merit.

The Sixth Circuit provides that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs*., 803 F.2d 211, 214

(6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").  The regulations indicate a consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," where such evidence is not contained in a medical source's records or where the medical source's evidence "cannot be obtained for reasons beyond [the claimant's] control."  20 C.F.R. § 404.1519a(b).

Here, Ms. Ponds has not identified additional clinical findings, laboratory tests, or diagnoses that were needed to complete the evidentiary record.  Instead, she argues that a consultative medical opinion was needed because the only mental health opinions of record— those of the state agency psychological consultants—were "outdated."  She asserts that further development was required because the state agency psychologists reviewed the record in late 2019, when Ms. Pond was not attending therapy, and therefore "did not have access to most of the medical evidence that documented [her] severe mental health symptoms."  (ECF Doc. 9, p. 17.)  Ms. Pond does not specify what specific medical evidence she is referencing here, and the parties identify only two therapy appointments that occurred after 2019.  (*See* Tr. 3491-96, 3698-3700.)  The ALJ referred to clinical findings from both of those 2020 treatment visits when he assessed Ms. Pond's mental functioning.  (Tr. 29-30 (citing Tr. 3495-96, 3698-99).)

Ultimately, "[t]here is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record."  *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x. 997, 1002 (6th Cir. 2011) (internal citations and quotations omitted).

33

"The opinions need only be supported by evidence in the case record."  *Id.*  Of course, there must be "some indication that the ALJ at least considered" the later medical records.  *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007); *Blakely*, 581 F.3d at 409 (*quoting Fisk*, 253 F. App'x at 585).  Here, the record reflects that the ALJ considered the entirety of the record, including treatment records post-dating the state agency review.  (Tr. 29, 30.)

For the reasons explained above, the Court finds Ms. Pond has failed to show that the ALJ was obligated to further develop the record by obtaining additional medical opinion evidence.  Accordingly, the Court finds Ms. Pond's first assignment of error is without merit.

### C.  Second Assignment of Error: Whether ALJ Erred in Finding Medical Opinion of CNS Harrington Was Not Persuasive

In her second assignment of error, Ms. Pond challenges the ALJ's evaluation of the February 6, 2019 opinion of her treating pain management specialist CNS Harrington.[4]  (ECF Doc. 9, pp. 18-22.)  She acknowledges that the ALJ provided reasons for finding CNS Harrington's opinion not persuasive, but contends that those reasons lack the support of substantial evidence.  (*Id*. at pp. 19-21.)  Further, she contends that the ALJ improperly relied on the state agency medical consultants over the opinion of CNS Harrington.  (*Id*. at pp. 21-22.)

#### 1.  Framework of Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors

---

[4] Ms. Pond incorrectly refers to CNS Harrington throughout her brief as "Dr. Harrington." (ECF Doc. 9.)

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

### 2. Whether ALJ's Reasons for Finding CNS Harrington's Opinion Not Persuasive Had the Support of Substantial Evidence

The ALJ evaluated the entirety of the record, including evidence relating to Ms. Pond's chronic pain and migraines (Tr. 34-35), and concluded that:

> [T]he claimant's conservative treatment suggests that her impairments are not as severe as she alleges. While the claimant takes prescription medication and has undergone physical therapy and lidocaine infusions, she has not reported any additional treatment for her physical impairments, including surgery []. Moreover, there is no indication in the record that the claimant's treating physicians have recommended any greater treatment modalities. In fact, the record indicates that one spinal surgeon advised the claimant she was not a surgical candidate []. The claimant's conservative treatment suggests that her symptoms and limitations are not as severe as she alleges.

(Tr. 36 (internal citations omitted) (emphasis added).)  The ALJ then evaluated the

persuasiveness of the medical opinion evidence, including the opinion of treating pain

management specialist CNS Harrington.  (Tr. 36.)  He described CNS Harrington's medical

opinion as follows, and explained why he found her opinion was not persuasive:

> In February 2019, Ann Harrington, CNS, assessed that the claimant could lift and/or
> carry nine pounds occasionally and five pounds frequently, stand and/or walk for
> forty minutes in an eight hour workday and ten minutes without interruption and
> could sit for forty minutes in an eight hour workday and for ten minutes without
> interruption []. Ms. Harrington also assessed that the claimant could rarely climb,
> balance, stoop, crouch, kneel and crawl and would rarely reach, push/pull and
> engage in fine and gross manipulation, []. It was noted that the claimant had been
> prescribed a cane, brace and tens unit []. Ms. Harrington opined the claimant had
> severe pain that interfered with concentration and would take her off task and cause
> absenteeism. She assessed the claimant required additional unscheduled rest
> periods during eight-hour workday consisting of "several hours" and needed to be
> able to alternate positions between sitting, standing, and walking at will.
>
> This opinion of Ms. Harrington is not persuasive. <u>The opinion is internally
> inconsistent with contemporaneous treatment notes as well as not generally
> supported by the evidence as a whole</u>. For example, the significant exertional
> limitations assessed are not supported by objective findings of 5/5 strength of lower
> extremities and normal gait []. Moreover, Ms. Harrington assessed the claimant has
> significant manipulative limitations which are not supported by the evidence
> documenting the claimant often had 5/5 strength of the upper extremities and
> demonstrated 5/5 grip strength bilaterally []. Finally, treatment records do not
> establish that the claimant has been prescribed a cane nor do the records establish
> that use of a cane is medically necessary given the findings of normal gait and full
> strength on examination [].

(Tr. 36 (internal citations omitted) (emphasis added).)

Ms. Pond argues that the ALJ's persuasiveness finding lacks the support of substantial

evidence.  (ECF Doc. 9, p. 19.)  In support, she notes that CNS Harrington treated her chronic

pain for years and highlights the various treatment modalities used to treat her chronic pain and

migraines, including emergency room visits and inpatient hospitalizations.  (*Id*. at pp. 19-20.)

She argues that her treatments—including physical therapy, aquatherapy, narcotic painkillers,

several different nerve pain medications, anti-inflammatories, oral and IV steroids, lumbar

injections, Lidocaine and Ketamine infusion, and use of a walker and TENS unit—were not

"conservative," contrary to the ALJ's characterization.  (*Id*. at p. 20.)  She also argues that the

physical examination findings of normal gait and full strength highlighted by the ALJ in support

of his findings "do[] not in fact undermine [CNS] Harrington's central conclusion," which is that

"Ms. Pond's chronic pain and migraines markedly interfere with her capacity to maintain steady

workplace attendance, remain on-task, and to not require additional workplace breaks."  (*Id.*)

Instead, Ms. Pond argues that "[t]he sum of the evidence, totaling thousands of pages of medical

records, strongly supports [CNS] Harrington's conclusion."  (*Id*.)

To the extent that Ms. Pond is arguing that the evidence supports—even "strongly

supports" (*id.*)—a finding that CNS Harrington's opinion was persuasive, that is not the legal

standard.  Even if a preponderance of the evidence supports a finding that CNS Harrington's

opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as

substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at

477; *Blakley*, 581 F.3d at 406.  Thus, regardless of whether there was evidence to strongly

support a finding that the limitations outlined in CNS Harrington's opinion were persuasive, the

question before this Court is whether there was substantial evidence in the record to support the

ALJ's finding to the contrary.

Here, the ALJ found CNS Harrington's "significant exertional limitations"—including

limitations to sitting or standing no more than forty minutes in a workday, rare (less than

occasional) postural activities, and no lifting or carrying over nine pounds—were not supported

by physical examination findings of full lower extremity strength and normal gait.  (Tr. 36.)  He

found her "significant manipulative limitations"—including rare (less than occasional) reaching,

pushing, pulling, and manipulation—were not supported by physical examination findings of full

upper extremity and grip strength.  (*Id.*)  He also found the treatment records did not support the medical necessity of using a cane, given the lack of a prescription and examinations showing full strength.  (*Id.*)  The ALJ ultimately concluded that the "significant" limitations in CNS Harrington's opinion were "internally inconsistent with [her] contemporaneous treatment notes" and "not generally supported by the evidence as a whole."  (*Id.*)  Thus, the ALJ explicitly considered the supportability of CNS Harrington's opinion and its consistency with other records, and clearly explained his reasoning for finding the opinion was not persuasive.

In determining the RFC, the ALJ also considered the opinions of the state agency medical consultants, who opined that Ms. Pond could perform light exertional work with additional functional limitations, finding their opinions persuasive.  (Tr. 36-37.)  Ms. Pond argues that these opinions "were rendered without any physical examinations, access to a significant part of the medical record, and are undermined but the substance of the evidence" (ECF Doc. 9, p. 21), but does not offer any specific argument as to what "significant" medical records they did not consider or what evidence undermined their findings.  Ms. Pond also asserts summarily that the state agency opinions are "unsupported" because the records show that she suffers chronic pain and migraines, has "received virtually every imaginable treatment" without improvement, and "requires constant care, frequent treatment at emergency rooms and inpatient hospitalizations, and has to lie down several times a day[.]"  (ECF Doc. 9, pp. 21-22.)  Again, the question before this Court is whether the ALJ's findings were supported by substantial evidence, not whether the evidence would support the contrary finding now proposed by Ms. Pond.  The ALJ articulated specific reasons for finding the state agency opinions persuasive (Tr. 36-37), and Ms. Pond has not shown that those findings were erroneous. [5]  She has not specifically identified what—if

---

[5] To the extent Ms. Pond intended to assert a separate challenge to the ALJ's finding that the state agency opinions were persuasive, that argument was not clearly articulated or adequately developed and is deemed waived.  *See*

any—records the ALJ failed to consider in reaching his findings.  Instead, she describes and characterizes the evidence, and argues that her impairments are more disabling than the state agency medical consultants and ALJ found them to be.  She has failed to show that the ALJ's consideration of the state agency opinions lacked the support of substantial evidence.

As to Ms. Pond's argument that the ALJ erred in characterizing her treatments as "conservative" (ECF Doc. 9, p. 20), she has failed to demonstrate that the ALJ's finding lacked the support of substantial evidence.  In finding that Ms. Pond's "conservative treatment suggests that her impairments are not as severe as she alleges," the ALJ acknowledged that her treatments included medication, physical therapy, and lidocaine infusions, but noted that she did not report surgical interventions, and did not show that her treating providers "recommended any greater treatment modalities."  (Tr. 36.)  While Ms. Pond argues summarily that her treatments were not "conservative," she does not specifically identify what greater treatment modalities the ALJ failed to account for (ECF Doc. 9. Pp. 19-20), and a review of the record does not fill in this gap.  Indeed, the record reflects that her neurosurgeon did not recommend surgical intervention for Ms. Pond's back pain in September 2015, instead advising that "weight loss and stopping smoking [were] the two best strategies to improve her pain and overall spine health."  (Tr. 862.)  Similarly, Ms. Pond's orthopedist recommended in January 2018 that she "continue conservative treatment with medications, therapy, injections, modalities" for her shoulder pain.  (Tr. 1924.)  Thus, Ms. Pond has failed to show that the ALJ's consideration of the conservative nature of her treatments lacked the support of substantial evidence.

---

*Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Ms. Pond's argument that the "issue of conservative treatment conclusions is outside the province of the ALJ's expertise" also lacks merit.  (*Id*. at p. 21 (citing *Ingram v. Comm'r of Soc. Sec.*, No. 1:20-CV-2692, 2022 WL 2237807, at *7 (N.D. Ohio June 22, 2022); *Henderson v. Commissioner of Social Security*, No. 1:20-CV-1712-JRA, 2021 WL 7251999, at *9 (N.D. Ohio Oct. 27, 2021), *report and recommendation adopted sub nom*., 2022 WL 627034 (N.D. Ohio Mar. 3, 2022)).)  Neither of the cases cited by Plaintiff stand for the proposition that an ALJ cannot find based on a review of the records that a claimant's treatment was "conservative" in nature.  In *Ingram*, the court found it was appropriate for an ALJ to conclude that "[t]aking pain medication, even Percocet, is considered a conservative course of treatment."  *Ingram*, 2022 WL 2237807, at *7.  In *Henderson*, the ALJ's conclusion that treatment was "conservative" was found to be "inconsistent with the record as a whole" when the claimant had undergone three back surgeries and was "cautioned against further spinal surgery because it would cause more rapid degeneration in the spine."  *Henderson*, 2021 WL 7251999, at *9.  Neither decision is inconsistent with the ALJ's finding in this case that treatment which *included* prescription medication, therapy, and injections but *excluded* surgery was "conservative."

The questions before this Court are whether the ALJ considered the full record in evaluating the persuasiveness of CNS Harrington's opinion, appropriately articulated his reasons for finding the opinion unpersuasive, and made a determination that was supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings regarding medical opinions); 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405 ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

For the reasons stated above, the undersigned finds Ms. Pond has not met her burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of the medical opinions, that he failed to sufficiently articulate his reasons for finding the opinions "not persuasive," or that his persuasiveness finding lacked the support of substantial evidence. Accordingly, the undersigned finds the second assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 5, 2024

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE